**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

FAUSTINO ARMENTA, FRANCISCO ROMERO
PONCE, CONSUELO REYES MALDONADO,                    **14-cv-5766 (ALC)**
EFRAIN DIONISIO RODRIGUEZ, GUILLERMO                **15-cv-5937(ALC)**
FERNANDEZ GALINDO,  CRISTIAN REYES,                  **15-cv-8762 (ALC)**
PEDRO CANDO AND JUAN CANDO, *individually*           **16-cv-1885 (ALC)**
*and on behalf of others similarly situated,*
                                   *Plaintiffs*,

                                                      **PLAINTIFFS'**
                                                      **PROPOSED FINDINGS**
              -against-                               **OF FACT AND**
PARAMOUNT FOODS INC. (d/b/a BALUCHI'S),               **CONCLUSIONS OF LAW**
KRAJ FOODS INC. (d/b/a BALUCHI'S) and
RAKESH AGGARWAL,

                          *Defendants.*
----------------------------------------------------------------X
----------------------------------------------------------------X
JESUS ANGEL BASURTO, *individually and on*
*behalf of others similarly situated,*

*Plaintiff,*

-against-

PARAMOUNT FOODS INC. (d/b/a BALUCHI'S)
and RAKESH AGGARWAL,

                          *Defendants.*
----------------------------------------------------------------X
----------------------------------------------------------------X
ARISTEO JUAREZ PEREZ, FRANSISCO LUNA
ALTAMIRANO, LUIS PEREZ ZARATE, OROPEZA
CASTRO RODRIGUEZ, and RAUL CASTRO,
*individually and on behalf of others similarly situated,*

*Plaintiff,*

-against-

PARAMOUNT FOODS INC. (d/b/a BALUCHI'S)
and RAKESH AGGARWAL,

                          *Defendants.*
----------------------------------------------------------------X

```
-----------------------------------------------------------------X
```
MARVIN CHUMIL, *individually and on behalf of*
*others similarly situated,*

    *Plaintiff,*

-against-

PARAMOUNT FOODS INC. (d/b/a BALUCHI'S ),
RAKESH AGGARWAL and ROHAN AGGARWAL,

              *Defendants.*
```
-----------------------------------------------------------------X
```

    Plaintiffs, by their attorneys Michael Faillace & Associates, hereby submit their proposed findings of fact and conclusions of law.

### Plaintiff's Proposed Findings of Fact

<u>Facts Relevant to All Plaintiffs</u>

    1.    Baluchi's was a chain of Indian restaurants with locations at 329 Third Avenue, New York, New York 10010 (the "Third Avenue Location"), 1431 First Avenue, New York, New York 10021 (the "First Avenue Location"), 275 Greenwich Street, New York, New York 10007 (the "Greenwich Street Location"). 310 Fifth Avenue, Brooklyn, NY 11220 (the "First Brooklyn Location") and 257 Smith Street, Brooklyn, New York 11231 (the "Second Brooklyn Location"). (Stip No. 7)

    2.    Baluchi's is owned and operated by Paramount Foods Inc., Kraj Foods Inc. and Rakesh Aggarwal.  (Stip No. 6)

    3.    Rakesh Aggarwal (1) determined employees' compensation, (2) determined employees' work hours and schedules, (3) determined employees' statuses as exempt or

nonexempt, (4) maintained payroll records, (5) paid employees, (6) hired and fired employees, (7) managed and supervised employees.  (Stip No. 10)

4.      Baluchi's employees used items, including ingredients and cleaning products, that originated outside the State of New York and moved in interstate commerce.   (Stip. No. 11)

5.      Baluchi's had annual gross sales during the relevant period exceeding $500,000. (Stip. No. 12)

6.      Plaintiffs were employed by Defendants at Baluchi's in a variety of positions, including dishwasher, delivery worker, and food preparer.  (Plaintiff Decs.)

Plaintiff Faustino Armenta

7.      Faustino Armenta was hired and began his employment with Baluchi's Third Avenue Location in September 2011.  (Armenta Dec. ¶4)

8.      Armenta worked at Baluchis Third Avenue Location until July 23, 2014.  (*Id.*)

9.      From the start of his employment until June 2013, Armenta worked from 5:00 p.m. to 11:00 p.m. seven days per week.  (*Id.* ¶10)

10.     From June 2013 to March 2014 Armenta worked from 5:00 p.m. to 12:00 a.m. seven days per week.  (*Id.* ¶11)

11.     From March 2014 until the end of his employment in July 23, 2014, Armenta worked from 5:00 p.m. to 11:00 p.m. seven days per week.      (*Id.* ¶12)

12.     At the start of his employment, Armenta was paid a fixed salary of $16 per day. (*Id.* ¶16)

13.     From September 2012 until June 2013, Armenta was paid a fixed salary of $20 per day.  (*Id.* ¶17)

14.     From June 2013 until March 2014, Armenta was paid a fixed salary of $30 per day. (*Id.* ¶18)

15.     From March 2014 until the end of his employment on July 23, 2014, Armenta was paid a fixed salary of $20 per day.  (*Id.* ¶19)

16.     Armenta worked almost every day during his employment at Baluchi's.  (*Id.* ¶14)

17.     Armenta did not have a meal break or rest period during his work hours.  (*Id.* ¶15)

18.     Baluchi's did not give Armenta any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶24)

19.     Baluchi's paid Armenta in cash until approximately December 2013, when it began to pay Armenta by check. The checks would include both wages and tips.  (*Id.* ¶20)

20.     Baluchi's never gave Armenta a written notice of his wages stating his rate of pay. (*Id.* ¶25)


Plaintiff Consuelo Reyes Maldonado

21.     Consuelo Reyes Maldonado was hired and began his employment with Baluchi's Third Avenue Location in December 2010.  (Reyes Maldonado Dec. ¶4)

22.     Reyes Maldonado worked at Baluchi's Third Avenue Location until January 2012, then returned in September 2013 and worked until July 23, 2014.  (*Id.*)

23.     From the start of his employment in December 2010 until January 2012, Reyes Maldonado worked from 11:00 A.M. until 10:30 P.M. six days a week with a break between 3:00 P.M. and 5:00 P.M. on Mondays through Fridays.  He did not have any such break on weekends. (*Id.* ¶7)

24.    From September 2013 to the end of his employment on July 23, 2014 Reyes Maldonado worked from 11:00 a.m. to 3:00 p.m., and from 5:00 p.m. to 11:00 p.m., six days per week.  (*Id.*)

25.    At the start of his employment, Reyes Maldonado was paid a fixed salary of $350 per week.  (*Id.* ¶8)

26.    From September 2013 until the end of his employment on July 23, 2014, Reyes Maldonado was paid a fixed salary of $20 per shift, or $40 per day.  (*Id.* ¶9)

27.    Reyes Maldonado worked every day during his employment at Baluchi's.  (*Id.* ¶12)

28.    Reyes Maldonado did not have a meal break or rest period during his work shift hours.  (*Id.* ¶13)

29.    Baluchi's did not give Reyes Maldonado any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶17)

30.    Baluchi's paid Reyes Maldonado in cash during his employment from 2010 to 2012, and by check during his employment in 2013 and 2014.  (*Id.* ¶15)

31.    Baluchi's never gave Reyes Maldonado a written notice of his wages stating his rate of pay.  (*Id.* ¶18)

32.    Reyes Maldonado purchased items for his delivery work at Baluchi's, including a bicycle for $250, a motorized bike for $1450, a helmet for $40 each, a vest for $20.00 and lights for his bike for $30.  (*Id.* ¶20)

Plaintiff Efrain Dioniso Rodriguez

33.    Efrain Dionisio Rodriguez was hired and began his employment with Baluchi's Third Avenue Location in February 2013.  (Dionisio Rodriguez Dec. ¶4)

34.     Dionisio Rodriguez worked at Baluchi's Third Avenue Location until July 23, 2014.  (*Id.*)

35.     Throughout his employment, Dionisio Rodriguez worked from 5:00 p.m. to 11:00 p.m. six days per week.  (*Id.* ¶9)

36.     Throughout his employment, Dionisio Rodriguez was paid a fixed salary of $20 per day.  (*Id.* ¶13)

37.     Dionisio Rodriguez worked every day during his employment at Baluchi's.  (*Id.* ¶11)

38.     Dionisio Rodriguez did not have a meal break or rest period during his work shift hours.  (*Id.* ¶12)

39.     Baluchi's did not give Dionisio Rodriguez any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶18)

40.     Baluchi's paid Dionisio Rodriguez in cash until approximately February 2014, when they began paying him by check.  The checks included both his wages and any tips that he earned.  (*Id.* ¶14)

41.     Baluchi's never gave Dionisio Rodriguez a written notice of his wages stating his rate of pay.  (*Id.* ¶19)

42.     Dionisio Rodriguez purchased items for his delivery work at Baluchi's, including one bicycle for $500, a helmet for $50, a vest for $20, and six lights for $15 each.  He also was required to pay for $150 in repairs to his bicycle after it was damaged.  (*Id.* ¶21)

Guillermo Fernandez Galindo

43.      Guillermo Fernandez Galindo was hired and began his employment with Baluchi's Third Avenue Location in August 2013.  (Fernandez Galindo Dec. ¶4)

44.     Fernandez Galindo worked at Baluchi's Third Avenue Location until May 2014. (*Id.*)

45.     Throughout his employment, Fernandez Galindo worked from 11:00 a.m. until 3:00 p.m. and from 5:00 p.m. until 11:00 p.m. six days per week.  (*Id.* ¶9)

46.     Throughout his employment, Fernandez Galindo was paid a fixed salary of $40 per day.  (*Id.* ¶13)

47.     Fernandez Galindo worked every day during his employment at Baluchi's.  (*Id.* ¶11)

48.     Fernandez Galindo did not have a meal break or rest period during his work shift hours.  (*Id.* ¶12)

49.     Baluchi's did not give Fernandez Galindo any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶18)

50.     Baluchi's paid Fernandez Galindo in cash until approximately September 2013, when they began paying him by check.  The checks included both his wages and any tips that he earned.  (*Id.* ¶14)

51.     Baluchi's never gave Fernandez Galindo a written notice of his wages stating his rate of pay.  (*Id.* ¶19)

52.     Fernandez Galindo purchased items for his delivery work at Baluchi's, including one bicycle for $1,400, three sets of tires for $50 each a helmet for $60, a vest for $35, and two sets of lights for $20 each.  (*Id.* ¶21)

Aristeo Juarez Perez

53.     Aristeo Juarez Perez was hired and began his employment with Baluchi's Second Avenue Location in November 2014.  (Juarez Perez Dec. ¶4)

54.     Juarez Perez worked at Baluchi's Second Avenue Location until October 26, 2015. (*Id.*)

55.     Throughout his employment, Juarez Perez worked from 10:30 a.m. to 10:30 p.m. six days per week.  (*Id.* ¶9)

56.     Throughout his employment, Juarez Perez was paid a fixed salary of $20 per shift (or $40 per day).   (*Id.* ¶13)

57.     Juarez Perez worked every day during his employment at Baluchi's.  (*Id.* ¶11)

58.     Juarez Perez did not have a meal break or rest period during his work shift hours. (*Id.* ¶12)

59.     Baluchi's did not give Juarez Perez any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶16)

60.     Baluchi's paid Juarez Perez in cash until approximately October 2015, when they began paying him by check.  However, when they paid Juarez Perez by check, they checks were returned for insufficient funds.  (*Id.* ¶13)

61.     Baluchi's never gave Juarez Perez a written notice of his wages stating his rate of pay.  (*Id.* ¶17)

62.     Juarez Perez purchased items for his delivery work at Baluchi's, including two bicycles for $1000 (one for $500 and another for $500), a helmet for $ 35, and spent $350 on bike repairs.  (*Id.* ¶19)

Francisco Luna Altamirano

63.     Francisco Luna Altamirano was hired and began his employment with Baluchi's Second Avenue Location in August 2012.  (Luna Altamirano Dec. ¶4)

64.     Luna Altamirano worked at Baluchi's Second Avenue Location until October 26, 2015.  (*Id.*)

65.     Throughout his employment, Luna Altamirano worked from 5:00 p.m. to 10:30 p.m. six days per week.  (*Id.* ¶9)

66.     Throughout his employment, Luna Altamirano was paid a fixed salary of $20 per shift.  (*Id.* ¶14)

67.     Luna Altamirano worked every day during his employment at Baluchi's.  (*Id.* ¶11)

68.     Luna Altamirano did not have a meal break or rest period during his work shift hours.  (*Id.* ¶12)

69.     Baluchi's did not give Luna Altamirano any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶16)

70.     Baluchi's paid Luna Altamirano in cash until approximately October 2015, when they began paying him by check.  However, when they paid Luna Altamirano by check, the checks were returned for insufficient funds.  (*Id.* ¶13)

71.     Baluchi's never gave Luna Altamirano a written notice of his wages stating his rate of pay.  (*Id.* ¶17)

72.     Luna Altamirano purchased items for his delivery work at Baluchi's, including three bicycles (one for $80, one for $110, and one for $650), a vest for $20, a chain and a lock for $60.00, a bike helmet for $25.00, and $1500.00 in bike repairs..  (*Id.* ¶19)

Luis Perez Zarate

73.     Luis Perez Zarate was hired and began his employment with Baluchi's Second Avenue Location in August 2012.  (Perez Zarate Dec. ¶4)

74.     Luis Perez Zarate worked at Baluchi's Second Avenue Location until October 26,

9

2015.  (*Id.* ¶4)

75.     Throughout his employment, Luis Perez Zarate worked from 5:00 p.m. to 10:30 p.m. six days per week.  (*Id.* ¶9)

76.     Throughout his employment, Luis Perez Zarate was paid a fixed salary of $20 per shift.  (*Id.* ¶14)

77.     Luis Perez Zarate worked every day during his employment at Baluchi's.  (*Id.* ¶11)

78.     Luis Perez Zarate did not have a meal break or rest period during his work shift hours.  (*Id.* ¶12)

79.     Baluchi's did not give Luis Perez Zarate any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶16)

80.     Baluchi's paid Luis Perez Zarate in cash until approximately October 2015, when they began paying him by check.  However, when they paid Luis Perez Zarate by check, the checks were returned for insufficient funds.  (*Id.* ¶13)

81.     Baluchi's never gave Luis Perez Zarate a written notice of his wages stating his rate of pay.  (*Id.* ¶17)

82.     Luis Perez Zarate purchased items for his delivery work at Baluchi's, including two bicycles (one for $300 and one for $250), a helmet for $40, a chain and a lock for $60, a vest for $20, and $1000 in bike repairs.  (*Id.* ¶19)

Cristian Reyes

83.     Cristian Reyes was hired and began his employment with Baluchi's at the Third Avenue Location in April 2011.  (Reyes Dec. ¶4)

84.     Cristian Reyes worked at Baluchi's Third Avenue Location until June 2013.  (*Id.* ¶4)

85.     Throughout his employment, Cristian Reyes worked two shifts a day from 10:30 a.m. to 3:00 p.m. and then from 5:00 p.m. until 10:30 p.m. on Mondays through Fridays. On Saturdays he worked from 10:30 a.m. until 10:30 p.m.  (*Id.* ¶7)

86.     Throughout his employment, Cristian Reyes was paid a fixed salary, from April 2011 to April 2012 he was paid $350 per week in cash and from April 2012 until June 2013 he was paid $400 per week by check.  (*Id.* ¶12)

87.     Cristian Reyes worked every day during his employment at Baluchi's.  (*Id.* ¶10)

88.     Cristian Reyes did not have a meal break or rest period during his work shift hours.  (*Id.* ¶11)

89.     Baluchi's did not give Cristian Reyes any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶14)

90.     Baluchi's paid Cristian Reyes in cash until approximately April 2012, when they began paying him by check.  (*Id.* ¶12)

91.     Baluchi's never gave Cristian Reyes a written notice of his wages stating his rate of pay.  (*Id.* ¶15)

92.     Cristian Reyes purchased items for his delivery work at Baluchi's, including one bicycle (for $250), three sets of lights for $15 each, and a helmet for $30.  (*Id.* ¶19)

Plaintiff Jose Najera

93.     Jose Najera was hired and began his employment with Baluchi's at the Third Avenue Location in July 2011.  (Najera Dec. ¶4)

94.     Jose Najera worked at Baluchi's Third Avenue Location until August 2013.  (*Id.* ¶4)

95.    From the start of his employment until January 2012, Jose Najera  worked from 5:00 p.m. to 11:00 p.m. six days per week  (*Id.* ¶9)

96.    From January 2012 until the end of his employment in August 2013, Jose Najera worked from 10:30 a.m. to 11:00 p.m. six days per week.  (*Id.* ¶10)

97.    From the start of his employment until March 2012, Najera was paid a fixed salary of $16 per shift.  When he worked two shifts per day he received $32 per day.  (*Id.* ¶14)

98.    From March 2012 until the end of his employment in August 2013, Najera was paid $20 per shift ($40 per day).   (*Id.*¶15)

99.    Jose Najera worked every day during his employment at Baluchi's.  (*Id.* ¶12)

100.    Jose Najera did not have a meal break or rest period during his work shift hours. (*Id.* ¶13)

101.    Baluchi's did not give Jose Najera any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶19)

102.    Baluchi's paid Jose Najera in cash during all times of his employment.  (*Id.* ¶16)

103.    Baluchi's never gave Jose Najera  a written notice of his wages stating his rate of pay. (*Id.* ¶20)

104.    Jose Najera purchased items for his delivery work at Baluchi's, including three bicycles: one for $300, one for $150, and one for $200.  (*Id.* ¶22)

Jose Ivan Islas

105.    Jose Ivan Islas was hired and began his employment with Baluchi's at the Greenwich Street Location in February 2013.  (Islas Dec. ¶4)

106.    Jose Ivan Islas worked at Baluchi's Greenwich Street Location until March 20, 2014. (*Id.* ¶4)

107.    Throughout his employment, Jose Ivan Islas regularly worked from 5:00 p.m. to 11:00 p.m. Monday through Friday, and from 11:00 a.m. to 11:00 p.m. on Sundays. About once a month he would also work on Saturdays from 11:00 a.m. to 11:00 p.m. to take another employee's place when they called out sick.  (*Id.* ¶9)

108.    Throughout his employment, Jose Ivan Islas was paid a fixed salary of $20 per day Monday through Friday, and $40 per day Saturdays when he worked a double shift.  (*Id.* ¶13)

109.    Jose Ivan Islas worked every day during his employment at Baluchi's.  (*Id.* ¶11)

110.    Jose Ivan Islas did not have a meal break or rest period during his work shift hours. (*Id.* ¶12)

111.    Baluchi's did not give Jose Ivan Islas any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶18)

112.    Baluchi's paid Jose Ivan Islas in cash during all times of his employment.  (*Id.* ¶14)

113.    Baluchi's never gave Jose Ivan Islas a written notice of his wages stating his rate of pay.  (*Id.* ¶19)

114.    Jose Ivan Islas purchased items for his delivery work at Baluchi's, including three bicycles for $150 each, two helmets for $50 each, and five vests for $20 each.  (*Id.* ¶21)

Nicolas Tepi Calpeno

115.    Nicolas Tepi Calpeno was hired and began his employment with Baluchi's at the Greenwich Street Location in March 2013.  (Tepi Calpeno Dec. ¶4)

116.    Nicolas Tepi Calpeno worked at Baluchi's Greenwich Street Location until November 2013.  (*Id.* ¶4)

117.    Throughout his employment, Nicolas Tepi Calpeno regularly worked from 5:00 p.m. to 10:30 p.m. p.m. Monday through Friday, and from 10:30 a.m. to 10:30 p.m. on Saturdays. (*Id.* ¶9)

118.    Throughout his employment, Nicolas Tepi Calpeno was paid a fixed salary of $20 per shift.  (*Id.* ¶14)

119.    Nicolas Tepi Calpeno worked every day during his employment at Baluchi's.  (*Id.* ¶11)

120.    Nicolas Tepi Calpeno did not have a meal break or rest period during his work shift hours.  (*Id.* ¶12)

121.    Baluchi's did not give Nicolas Tepi Calpeno any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶16)

122.    Baluchi's paid Nicolas Tepi Calpeno in cash during all times of his employment. (*Id.* ¶13)

123.    Baluchi's never gave Nicolas Tepi Calpeno a written notice of his wages stating his rate of pay.  (*Id.* ¶17)

124.    Nicolas Tepi Calpeno purchased items for his delivery work at Baluchi's, including a bicycle for $200, two helmets for $50 each, a vest for $25.00 and $200 in bike repairs and maintenance.  (*Id.* ¶19)

Isidro Mendoza

125.    Isidro Mendoza was hired and began his employment with Baluchi's at the Greenwich Street Location in August 2014.  (Mendoza Dec. ¶4)

126.    Isidro Mendoza worked at Baluchi's Greenwich Street Location until June 30, 2015.  (*Id.* ¶4)

127.   Throughout his employment, Isidro Mendoza regularly worked from 5:00 p.m. to 10:30 p.m. 6 days per week.  However, he frequently was required to work longer hours.  (*Id.* ¶9)

128.   Throughout his employment, Isidro Mendoza was paid a fixed salary of $120 per week.  (*Id.* ¶14)

129.   Isidro Mendoza worked every day during his employment at Baluchi's.  (*Id.* ¶11)

130.   Isidro Mendoza did not have a meal break or rest period during his work shift hours.  (*Id.* ¶12)

131.   Baluchi's did not give Isidro Mendoza any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶16)

132.   Baluchi's paid Isidro Mendoza in cash during most of his employment, at times being paid instead by a personal check.  (*Id.* ¶13)

133.   Baluchi's never gave Isidro Mendoza a written notice of his wages stating his rate of pay.  (*Id.* ¶17)

134.   Isidro Mendoza purchased items for his delivery work at Baluchi's, including a bicycle for $400, a helmets for $40 each, and about $150 in bike repairs and maintenance.  (*Id.* ¶19)

Jesus Angel Basurto

135.   Jesus Angel Basurto was hired and began his employment with Baluchi's at the First Avenue Location in July 2004.  (Angel Basurto Dec. ¶4)

136.   Jesus Angel Basurto worked at the Baluchi's First Avenue Location until October 2009.  (*Id.*)

137.   Jesus Angel Basurto began worked at the Baluchi's Greenwich Street Location in November 2009.  (*Id.* ¶5)

138.   Jesus Angel Basurto worked at Baluchi's Greenwich Street Location until June 30, 2015.  (*Id.*)

139.   Throughout his employment at Baluchi's First Avenue Location, Jesus Angel Basurto regularly worked from 10:00 a.m. to 10:30 p.m. for six days per week, with a daily two hour break.  (*Id.* ¶4)

140.   Throughout his employment at Baluchi's First Avenue Location, Jesus Angel Basurto was paid a fixed salary of $300 per week.  (*Id.*)

141.   Throughout his employment at Baluchi's Greenwich Street Location, Jesus Angel Basurto worked from 10:30 a.m. to 10:30 p.m six days per week, without any breaks.  (*Id.* ¶5)

142.   Throughout his employment at Baluchi's Greenwich Street Location, Jesus Angel Basurto was paid $20 per shift.  (*Id.*)

143.   Jesus Angel Basurto worked every day during his employment at Baluchi's.  (*Id.* ¶10)

144.   Baluchi's did not give Jesus Angel Basurto any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶13)

145.   Baluchi's paid Jesus Angel Basurto in cash until November 2014,  at which point Baluchi's paid him instead by a personal check.  (*Id.* ¶11)

146.   Baluchi's never gave Jesus Angel Basurto a written notice of his wages stating his rate of pay.  (*Id.* ¶14)

147.   Jesus Angel Basurto purchased items for his delivery work at Baluchi's, including three bicycles totaling $1,000, and $900 in bike repairs and maintenance.  (*Id.* ¶19)

Guadalupe Bautista

148.   Guadalupe Bautista was hired and began his employment with Baluchi's at the Greenwich Street Location in December 2013.  (Bautista Dec. ¶4)

149.   Guadalupe Bautista worked at Baluchi's Greenwich Street Location until June 30, 2015.  (*Id.* ¶4)

150.   Throughout his employment, Guadalupe Bautista regularly worked from 5:00 p.m. to 10:00 p.m. four days per week and from 5:00 p.m. to 10:30 p.m. two days a week.  (*Id.* ¶9)

151.   Throughout his employment, Guadalupe Bautista was paid a fixed salary of $20 per shift.  (*Id.* ¶14)

152.   Guadalupe Bautista worked every day during his employment at Baluchi's.  (*Id.* ¶11)

153.   Guadalupe Bautista did not have a meal break or rest period during his work shift hours.  (*Id.* ¶12)

154.   Baluchi's did not give Guadalupe Bautista any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶16)

155.   Baluchi's paid Guadalupe Bautista in cash during most of his employment, and was paid by personal check in the last two or three weeks of his employment.  (*Id.* ¶13)

156.   Baluchi's never gave Guadalupe Bautista a written notice of his wages stating his rate of pay.  (*Id.* ¶17)

157.   Guadalupe Bautista purchased items for his delivery work at Baluchi's, including two bicycles for $250 total.  (*Id.* ¶19)

<u>Marvin Chumil</u>

158.   Marvin Chumil was hired and began his employment with Baluchi's at the Fifth Avenue Location in March 2014.  (Chumil Dec. ¶4)

159.    Marvin Chumil worked at the Baluchi's Fifth Avenue Location until January 2015. (*Id.*)

160.    Marvin Chumil began working at the Baluchi's Smith Street Location in September 2015.  (*Id.*)

161.    Marvin Chumil worked at Baluchi's Smith Street Location until October 2015. (*Id.*)

162.    Throughout his employment at the Baluchi's Fifth Avenue Location, Marvin Chumil regularly worked from 10:30 a.m. until 3:00 p.m. and from 5:00 p.m. until 11:00 p.m. 4 days a week, and from 10:30 a.m. 11:00 p.m. on Saturdays and Sundays.  (*Id.* ¶7)

163.    Throughout his employment at Baluchi's Fifth Avenue Location, Marvin Chumil was paid a fixed salary of $400 per week.  (*Id.* ¶12)

164.    Throughout his employment at Baluchi's Smith Street Location, Chumil worked from 5:00 p.m. until on or about 11:00 p.m. on Thursdays, Saturdays and Sundays.  (*Id.* ¶8)

165.    Throughout his employment at Baluchi's Smith Street Location, Chumil was paid a fixed rate of $20 per shift.

166.    Chumil worked every day during his employment at Baluchi's.  (*Id.* ¶10)

167.    Chumil did not have a meal break or rest period during his work shift hours.  (*Id.* ¶11)

168.    Baluchi's did not give Chumil any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶17)

169.    Baluchi's paid Chumil in cash until June 2014, at which point Defendants began paying Chumil by check.  (*Id.* ¶14)

170.    Baluchi's never gave Chumil a written notice of his wages stating his rate of pay. (*Id.* ¶18)

171.    Chumil purchased items for his delivery work at Baluchi's, including a motorized bicycle for $1,150.  (*Id.* ¶20)

Pedro Cando

172.    Pedro Cando was hired and began his employment with Baluchi's at the Greenwich Street Location in July 2009.  (P. Cando Dec. ¶4)

173.    Pedro Cando worked at Baluchi's Greenwich Street Location until August 30, 2014.  (*Id.*)

174.    From July 2009 until July 2010 Pedro Cando regularly worked from 5:00 p.m. to 10:00 p.m. six days per week.  (*Id.* ¶8)

175.    From July 2010 to July 2011, Pedro Cando regularly worked from 5:00 p.m. until 10:00 p.m. as a delivery worker and from 10:00 p.m. until 5:00 a.m. as a porter, six days per week. (*Id.* ¶9)

176.    From July 2011 until the end of his employment on August 30, 2014, Pedro Cando regularly worked from 10:30 a.m. until on or about 10:30 p.m. six days per week.  (*Id.* ¶10)

177.    Pedro Cando was paid a fixed salary of $120 per week from July 2009 to July 2010. (*Id.* ¶14)

178.    Pedro Cando was paid a fixed salary of $395 per week from July 2010 to July 2011. (*Id.*)

179.    Pedro Cando was paid a fixed salary of $240 per week from July 2011 until the end of his employment in August 2014.  (*Id.*)

180.    Pedro Cando worked every scheduled work day during his employment at Baluchi's.  (*Id.* ¶12)

181.    Pedro Cando did not have a meal break or rest period during his work shift hours.  (*Id.* ¶13)

182.    Baluchi's did not give Pedro Cando any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶17)

183.    Baluchi's paid Pedro Cando in cash during his employment.  (*Id.* ¶15)

184.    Baluchi's never gave Pedro Cando a written notice of his wages stating his rate of pay.  (*Id.* ¶18)

185.    Pedro Cando purchased items for his delivery work at Baluchi's, including three bicycles, two for $200 each and one for $1,400, and a helmet for $60, 2, a chain and lock for $60, and six sets of lights for $20 each ($120 total)**.**  (*Id.* ¶21)

Juan Cando

186.    Juan Cando was hired and began his employment with Baluchi's at the Greenwich Street Location in August 2010.  (J. Cando Dec. ¶4)

187.    Juan Cando stopped worked at Baluchi's Greenwich Street Location in December 2011, returned in August 2013, and stopped working on August 30, 2014 .  (*Id.*)

188.    From August 2010 to December 2011, Juan Cando regularly worked from 5:00 p.m. to 10:30 p.m. six days per week.  (*Id.* ¶7)

189.    From August 2013 to August 2014, Juan Cando regularly worked from 5:00 p.m. until 10:30 p.m. three days per week, and 5:00 p.m. to 11:00 p.m. three days per week.  (*Id.* ¶8)

190.    Juan Cando was paid a fixed salary of $120 per week throughout his employment.  (*Id.* ¶12)

191.    Juan Cando worked every scheduled work day during his employment at Baluchi's. (*Id.* ¶10)

192.    Juan Cando did not have a meal break or rest period during his work shift hours. (*Id.* ¶11)

193.    Baluchi's did not give Juan Cando any document stating how many hours he worked or how he was being paid, i.e. his rate of pay.  (*Id.* ¶15)

194.    Baluchi's paid Juan Cando in cash during his employment.  (*Id.* ¶13)

195.    Baluchi's never gave Juan Cando a written notice of his wages stating his rate of pay.  (*Id.* ¶16)

196.    Juan Cando purchased items for his delivery work at Baluchi's, including two bicycles, one for $100 and one for $200, and a helmet for $120. (*Id.* ¶19)


**Plaintiffs' Proposed Conclusions of Law**

Conclusions Applicable to All Plaintiffs

1.    The court has subject matter jurisdiction of this action.  29 U.S.C. § 216(b), 28 U.S.C. § 1337 and 28 U.S.C. § 1331.

2.    The claims arising under New York law are so related to the FLSA claims that they form part of the same case or controversy, and are therefore within the supplemental jurisdiction of the court.  28 U.S.C. § 1367.

3.    Baluchi's constitutes an enterprise engaged in commerce or in the production of goods in commerce within the meaning of the FLSA because its employees handle and work on

goods and materials that have been moved in and produced for commerce, and Baluchi's has annual gross sales of $500,000 or more.

4.      Baluchi's is thus subject to the minimum and overtime wage requirements of the FLSA.  *See* 29 U.S.C. §§ 206, 207.

5.      Both the FLSA and the NYLL define the term "employer" broadly for purposes of determining those who bear liability for unpaid wages.  *Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048, 2007 WL 313483, at *12 (S.D.N.Y. Feb. 1, 2007); *see* 29 U.S.C. § 203(d) (defining "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee"); N.Y. Lab. Law §§ 2(6), 651(6), 190(3); *see also Falk v. Brennan*, 414 U .S. 190, 195 (1973) (emphasizing "expansiveness" of the definition of employer under the FLSA).

6.      Paramount Foods, Inc., Kraj Foods Inc., and Rakesh Aggarwal were employers of Plaintiffs under the FLSA and NYLL.

7.      Under both federal and New York state law, and employee must be paid a minimum wage.  29 U.S.C. §206; N.Y. Lab. Law §652.

8.      Under the FLSA, the minimum wage rate from July 24, 2008 to July 24, 2009 was $6.55, and since July 24, 2009 the minimum wage has been $7.25 per hour.  29 U.S.C. §206(a)(1).

9.      The New York minimum wage rate was $7.15 per hour as of January 1, 2007. N.Y.L.L. §652(1).

10.     From July 24, 2009 to December 30, 2013 the New York minimum wage rate was the same as the FLSA rate, $7.25.  *Id.*

11.     From December 31, 2013 through December 30, 2014, the New York minimum wage rate was $8.00 per hour.  *Id.*

12.     From December 31, 2014 through December 30, 2015, the New York minimum wage rate was $8.75 per hour.  *Id.*

13.     Under both federal and New York state law, an employee must be paid at the rate of one and one-half times the employee's regular hourly rate for each hour the employee works in excess of 40 hours in a given workweek.  29 U.S.C. § 207(2)(C); N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.4.

14.     Overtime pay under the FLSA is calculated by applying a multiplier of one and one half to an employee's "regular rate" of pay. 29 C.F.R. § 778.107; 29 U.S.C. § 207(a)(1).

15.     The regular rate of pay "is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."  29 C.F.R. § 778.109; 29 U.S.C. § 207(e).

16.     Where an employee receives a straight weekly salary, there is a rebuttable presumption that the salary covers 40 hours worked.  Therefore, to determine the regular rate, the weekly salary is divided by 40 hours.  *Moon v. Kwon*, 248 F.Supp.2d 201, 207-08 (S.D.N.Y. 2002); *Giles v. City of New York*, 41 F.Supp.2d 308, 317 (S.D.N.Y. 1999); *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F.Supp.2d 372, 385 (E.D.N.Y. 2012).

17.     Under New York law, where an employee was paid a weekly salary, until January 1, 2011, the regular rate of pay was determined by dividing the weekly salary by the number of hours worked.  12 NYCRR §137-3.5.  Since January 1, 2011, the regular rate has been determined by dividing the weekly pay by the lesser of 40 hours or the number of hours the employee worked. 12 N.Y.C.R.R. §146-3.5

18.     Separate from any other regular or overtime wages, when an employee works more than 10 hours on any given day, the employee is entitled to receive "spread of hours" pay, which is an additional one-hour's pay at the applicable minimum wage rate.  12 NYCRR § 146-1.6; 12 NYCRR §137-1.7 (before Jan. 1, 2011).

19.     An employee-plaintiff under the FLSA bears the burden of proving that she performed work for which she was not properly compensated.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  A plaintiff may meet this burden "through estimates based on his own recollection."  *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 362 (2d Cir. 2011).

20.     Where an employer had failed to maintain accurate and complete records of the hours employees worked and the amounts they were paid, the plaintiff-employee need only to submit "sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred." *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997).  The burden then shifts to the employer to come forward with any evidence to either show "the precise amount of work performed," or to "negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88. If the employer fails to produce such evidence, the court may award damages to the employee, even though the result be only approximate. *Id.* at 688.   In the absence of rebuttal by defendants, the employees' recollections and estimates of hours worked are presumed to be correct.  *Amaya v. Superior Tile & Granite Corp.*, 2012 U.S. Dist. LEXIS 5246, *19, 2012 WL 130425 (S.D.N.Y. Jan. 17, 2012); *Zhao v. East Harlem Laundromat, Inc.*, 2010 U.S. Dist. LEXIS 121335, *15, 2010 WL 4628294 (S.D.N.Y. Oct. 8, 2010) (Report & Recommendation), *adopted in part by* 2010 U.S. Dist. LEXIS 121328, 2010 WL 4642459 (S.D.N.Y. Nov. 12, 2010).

21.     Here, Defendants have not produced any records of the hours Plaintiffs worked and the wages Plaintiffs were paid.  Plaintiffs' recollections should be accepted as reliable in the absence of rebuttal by the Defendants.  .

22.     Defendants failed to pay Plaintiffs the minimum and overtime wages required by the above provisions of the FLSA and the laws of New York, and also failed to pay the addition "spread of hours" pay required by New York law.  Accordingly, Defendants are liable to Plaintiffs for the unpaid wages to which he was entitled under the above provisions of the FLSA and the laws of New York.  29 U.S.C. § 216(b); N.Y. Labor Law § 663(1); 12 NYCRR § 146-1.6

23.     Under the FLSA, the statute of limitations applicable to claims for unpaid wages is two years, but is extended to three years if the violation is willful.  29 U.S.C. § 255(a).

24.     Under the FLSA a violation is considered willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." *Young v. Cooper Cameron Corp*., 586 F.3d 201, 207 (2d Cir 2009) (quoting *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988)); *Moon v. Kwon*, 248 F. Supp. 2d 201, 235 (S.D.N.Y. 2002) (NYLL test for willfulness same as test under FLSA).

25.     Defendants were aware, or should have been aware of the existence of the FLSA and its overtime requirements.  However, the Defendants knew or disregarded the fact that their conduct was prohibited by the FLSA.

26.     Defendants deliberate decision to disregard both FLSA and New York law, as well as Defendants' failure to take any affirmative step towards compliance, amount to willfulness for purposes of the FLSA and New York law.  *Doo Nam Yang v. ACBL Corp.,* 427 F. Supp. 2d 327, 340 (S.D.N.Y. 2005) ("A failure to pay is 'willful' when the employer knowingly, deliberately, or voluntarily disregards its obligation to pay wages") (internal quotation marks omitted).

27.     As Plaintiffs can establish that Defendants' violation of the FLSA was willful, the Plaintiffs are entitled to a three-year limitations period under the FLSA.  29 U.S.C. §255; *Decraene v. Neuhaus (U.S.A.), Inc.*, 2005 U.S. Dist. LEXIS 10836, at *23-*24 (S.D.N.Y. 2005).

28.     The statute of limitations for claims brought under the NYLL is six years.  N.Y. Lab. Law § 663(3).

29.     Under the FLSA, once liability is established the employee is entitled to recover all unpaid minimum and overtime wages, as well as "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  "Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA."  *McLean v. Garage Mgmt. Corp.*, 2012 U.S. Dist. LEXIS 55425, *12, 2012 WL 1358739 (S.D.N.Y. April 19, 2012) (quoting *Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)). The employer may escape liability for liquidated damages, however, if it can demonstrate that "it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 150 (2d Cir. 2008).  "The employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception." *McLean*, 2012 U.S. Dist. LEXIS 55425, *13 (quoting *Herman*, 172 F.3d at 142).  "To establish the requisite subjective good faith, an employer must show that it took active steps to ascertain the dictates of the FLSA and then act to comply with them."  *Id.* (quoting *Barfield*, 537 F.3d at 150.  Defendants have offered no evidence to meet this good faith requirement, and are therefore liable to pay liquidated damages under the FLSA.

30.     Under New York law, an employee is similarly entitled to recover liquidated damages related to any unpaid wages.  "Prior to November 24, 2009, plaintiffs were entitled to recover liquidated damages under the NYLL equal to 25% of unpaid wages if plaintiffs could prove that employers' NYLL violations were 'willful.'"  *McLean*, 2012 U.S. Dist. LEXIS 55425 at *21 (S.D.N.Y. April 19, 2012).

31.     The NYLL was amended such that a showing of willfulness is no longer a prerequisite to recovery of liquidated damages after November 24, 2009.  Rather, as under the FLSA, an employee is now entitled to recover liquidated damages under the NYLL unless the employer can establish a good faith basis for having failed to pay the required wages.  N.Y. Lab. Law § 198(1-a).  Given the uncontroverted evidence of Defendants' willfulness and lack of good faith, Plaintiffs are, by statute, entitled to liquidated damages under New York Labor Law.  NYLL § 663(1).

32.     Through April 8, 2011, liquidated damages on unpaid wages and spread of hours pay under the New York Minimum Wage law are computed at 25% of the unpaid wages.  The New York Labor Law was amended effective April 9, 2011, amending the recoverable amount of liquidated damages for unpaid wages to 100 percent; thus, from April 9, 2011 through the end of plaintiffs' employment, liquidated damages under the New York Labor Law are computed at 100% of the unpaid wages.  NYLL § 663(1).

33.     Numerous courts in this district have held that a plaintiff may recover both FLSA and NYLL liquidated damages for overlapping periods of time.  *See, e.g.*, *Merino v. Beverage Plus Am. Corp.*, 2012 U.S. Dist. LEXIS 140679,*8 (S.D.N.Y. Sept. 25, 2012) ("Most courts in this Circuit hold that a plaintiff may recover both forms of liquidated damages because the FLSA's damages are meant to be compensatory, while the state damages are meant to be punitive;"

27

following majority of courts and awarding recovery of liquidated damages under both FLSA and NYLL); *McLean*, 2012 U.S. Dist. LEXIS 55425 at *25-26 ("FLSA liquidated damages and NYLL liquidated damages serve fundamentally different purposes, and the plaintiffs are entitled to both FLSA and NYLL liquidated damages for unpaid wage").  The Second Circuit Court of Appeals, in a non-precedential order, has ruled that plaintiffs may not recover FLSA and NYLL liquidated damages for overlapping periods.  *Chowdhury v. Hamza Express Food Corp.*, 666 Fed. Appx. 59 (2d Cir. Dec. 7, 2016)  For the purposes of calculations presented herein, Plaintiffs calculate damages in accordance with *Chowdhury*, because although *Chowdhury* is not binding precedent, Plaintiffs anticipate this Court will not "flout germane guidance of a Circuit Court panel and . . . substitute its own conclusion of law."  *Diaz v. Aje Mgmt. Corp.*, 15-cv-1602 (AT) (JCF), 2017 U.S. Dist. LEXIS 4324, *9 (S.D.N.Y. Jan. 10, 2017) (quoting *United States v. Tejeda*, 824 F. Supp. 2d 473, 475 (S.D.N.Y. 2010)).  Plaintiffs do expressly request liquidated damages under both statute, in order to preserve the issue for appeal.

34.     Under New York law, the Court may award prejudgment interest pursuant to N.Y. C.P.L.R. § 5001 on an award of back pay.  *See McLean*, 2012 U.S. Dist. LEXIS 55425 at *27 ("courts typically award prejudgment interest on damages for NYLL violations"); *Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469, 485-86 (S.D.N.Y. 2001); *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 176 Misc. 2d 325, 336 (Sup. Ct. N.Y. C'ty 1997).  This is because under New York (and federal) law, prejudgment interest compensates the plaintiff for the defendant's interest-free use of the plaintiff's money.  *See Gierlinger v. Gleason*, 160 F.3d 858, 874 (2d Cir. 1998); *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 83 (2d Cir. 1994); *Reilly v. Natwest Mkts. Group,* 181 F.3d 253, 265 (2d Cir. 1999), *cert. denied*, 528 U.S. 1119 (2000).

35.     In addition, under New York law, prejudgment interest can be awarded in addition to liquidated damages.  This is because under New York law liquidated damages are considered a penalty, serving a different purpose as a sanction for willfully failing to pay wages.  *Carter v. Frito-Lay, Inc.*, 425 N.Y.S. 2d 115, 115 (1st Dep't 1980), *aff'd*, 52 N.Y.2d 994, 438 N.Y.S.2d 80 (1981).

36.     The New York prejudgment interest rate applies.  *McLean*, 2012 U.S. Dist. LEXIS 55425 at *28.  Under N.Y. C.P.L.R. § 5004, prejudgment interest runs at the rate of nine percent (9%) per annum simple interest.  *Id.*  As to the date from which interest is to be calculated, the statute states that "[w]here . . . damages were incurred at various times, interest [may] be computed . . . upon all of the damages from a single reasonable intermediate date."  N.Y. C.P.L.R. § 5001(b).  When claims that are reduced to judgment have arisen on different dates, the Court may compute prejudgment interest from an appropriate single median date.  *See  McLean*, 2012 U.S. Dist. LEXIS 55425 at *28 ("prejudgment interest on the plaintiffs' NYLL unpaid overtime wage damages shall be computed at a rate of nine (9) percent per annum from a single reasonable intermediate date").  Thus, prejudgment interest on Plaintiffs' back pay awards should be computed from the median of each relevant period to the date of judgment.

37.     The FLSA and the New York Labor Law both contain fee-shifting provisions for actions to recover unpaid wages.  29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the Plaintiff or Plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action"); N.Y. Labor Law § 663(1) ("[An employee] may recover . . . costs and such reasonable attorney's fees as may be allowed by the court").  Accordingly, Plaintiffs should be awarded attorneys' fees and costs in an amount to be determined after trial.

38.     The judgment against Defendants should provide that if any amounts remain unpaid ninety days after issuance of the judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of the judgment shall automatically increase by fifteen percent.  NYLL §198(4).

Plaintiffs' Damages

39.     Plaintiffs are owed damages as follows:

A.  Damages for Minimum Wage and Overtime Violations

1.   Faustino Armenta: $28,135.75

2.  Consuelo Reyes Maldonado: $28,943.50

3.  Efrain Dionisio Rodriguez: $11,217.00

4.  Guillermo Fernandez Galindo: $14,815.00

5.  Aristeo Juarez Perez: $27,014.00

6.  Francisco Luna: $24,050.25

7.  Luis Perez Zarate: $24,050.25

8.  Cristian Reyes: $14,772.50

9.  Jose Najera: $41,080.50

10. Jose Ivan Islas: $10,488.00

11. Nicolas Tepi Calpeno: $5,425.88

12. Isidro Mendoza: $7,071.30

13. Jesus Angel Basurto: $135,582.73

14. Guadalupe Bautista: $9,098.50

15. Marvin Chumil: $17,805.00

16. Juan Cando: $16,297.80

17. Pedro Cando: $84,887.00

B. <u>Liquidated Damages for Minimum Wage and Overtime Violations</u>

1. Faustino Armenta: $28,135.75

2. Consuelo Reyes Maldonado: $27,184.00

3. Efrain Dionisio Rodriguez: $11,217.00

4. Guillermo Fernandez Galindo: $14,815.00

5. Aristeo Juarez Perez: $27,014.00

6. Francisco Luna: $24,050.25

7. Luis Perez Zarate: $24,050.25

8. Cristian Reyes: $14,772.50

9. Jose Najera: $41,080.50

10. Jose Ivan Islas: $10,488.00

11. Nicolas Tepi Calpeno: $5,425.88

12. Isidro Mendoza: $7,071.30

13. Jesus Angel Basurto: $108.101.51

14. Guadalupe Bautista: $9,098.50

15. Marvin Chumil: $17,805.00

16. Juan Cando: $13,341.08

17. Pedro Cando: $74,161.25

C. <u>Spread of Hours Damages</u>

1. Consuelo Reyes Maldonado: $5,200.50

2. Guillermo Fernandez Galindo: $1,392.00

3. Aristeo Juarez Perez: $2,545.50

4. Cristian Reyes: $4,480.50

5. Jose Najera: $3,654.00

6. Jose Ivan Islas: $436.00

7. Nicolas Tepi Calpeno: $282.75

8. Jesus Angel Basurto: $13,909.50

9. Marvin Chumil: $691.00

10. Pedro Cando: $9,510.00


D. <u>Liquidated Damages on Spread of Hours Damages</u>

1. Consuelo Reyes Maldonado: $4,678.50

2. Guillermo Fernandez Galindo: $1,392.00

3. Aristeo Juarez Perez: $2,545.50

4. Cristian Reyes: $4,480.50

5. Jose Najera: $3,654.00

6. Jose Ivan Islas: $436.00

7. Nicolas Tepi Calpeno: $282.75

8. Jesus Angel Basurto: $11,005.88

9. Marvin Chumil: $691.00

10. Pedro Cando: $8,270.25

E.  Tools of the Trade Damages

    1.  Consuelo Reyes Maldonado: $1,790.00

    2.  Efrain Dionisio Rodriguez: $810.00

    3.  Guillermo Fernandez Galindo: $1,685.00

    4.  Aristeo Juarez Perez: $735.00

    5.  Francisco Luna: $2,445.00

    6.  Luis Perez Zarate: $1,670.00

    7.  Cristian Reyes: $325.00

    8.  Jose Najera: $650.00

    9.  Jose Ivan Islas: $650.00

    10. Nicolas Tepi Calpeno: $525.00

    11. Isidro Mendoza: $590.00

    12. Jesus Angel Basurto: $1,900

    13. Guadalupe Bautista: $250.00

    14. Marvin Chumil: $1,150.00

    15. Juan Cando: $2,160.00

    16. Pedro Cando: $2,160.00


F.  Wage Notice Violations

    $2,500 per Plaintiff

G.  Wage Statement Violations

    $2,500 per Plaintiff

Dated:  New York, New York
        June 8, 2017

                                     __/s/ Joshua S. Androphy
                                     Joshua S. Androphy, Esq.
                                     MICHAEL FAILLACE & ASSOCIATES, P.C.
                                     60 East 42nd Street, Suite 4510
                                     New York, NY 10165
                                     (212) 317-1200
                                     Michael@faillacelaw.com
                                     *Attorneys for Plaintiffs*